IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| DANEA SAUNDERS, | ) | |
| Plaintiff, | ) ) ) | CV 07-1092-KI |
| v. | ) ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) | OPINION AND ORDER |
| Defendant. | ) | |

KING, J.,

    Plaintiff Danea Saunders challenges the Commissioner's decision denying her applications for disability insurance benefits and supplemental security income payments under Titles II and XVI of the Social Security Act. I have jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). I AFFIRM the Commissioner's decision.

    The court reviews the Commissioner's decision to ensure that proper legal standards were applied and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g);

1 - OPINION AND ORDER

*Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). The administrative law judge ("ALJ") applied the five-step sequential disability determination process set forth in 20 C.F.R. §§ 404.1520 and 416.920. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Saunders alleged she became disabled on February 7, 2001, due to burning feet, depression, Bell's Palsy, carpal tunnel syndrome, arthritis in the hands, a spur in the foot, and memory loss. Admin. R. 70, 104. She had insured status under the Social Security Act through September 30, 2003, and must show that she was disabled on or before that date to prevail on her Title II claim. 42 U.S.C. § 423(a)(1)(A). *See Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998). Saunders argues the ALJ erroneously assessed her residual functional capacity ("RFC") and elicited testimony from the vocational expert ("VE") with a hypothetical question that did not accurately reflect her functional limitations.

## I.     RFC Assessment

The RFC assessment describes the work-related activities a claimant can still do on a sustained, regular and continuing basis, despite the functional limitations imposed by her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184. The RFC assessment must be based on all the evidence in the case record, and the ALJ must consider all allegations of limitations and restrictions. SSR 96-8p, 1996 WL 374184 * 5.

Saunders contends the ALJ failed to accurately assess her RFC because she improperly discredited Saunders's testimony, rejected the opinion of a state agency medical consultant, neglected to consider the impact of obesity on her functional limitations, and failed to develop the record regarding her mental impairments.

A.      **Saunders's Credibility**

Saunders testified at her hearing in June 2006 as follows. Neuropathy causes a constant burning sensation in her feet and prevents her from wearing socks or closed-toe shoes. Admin. R. 415-17. If she stands for more than 20 minutes, her knees begin to go numb. *Id.* at 418. Carpal tunnel syndrome prevents her from driving or holding a pencil or pen for more than 20 minutes because her hands fall asleep. *Id.* Saunders uses her hands for no more than one hour a day. *Id.* at 419. She has Bell's Palsy. *Id.* at 419-20. She has residual back problems from a motor vehicle accident at the age of 14. *Id.* at 421. She has severe depression and bipolar mood swings. *Id.* at 422. She cannot concentrate or remember anything and she is uncomfortable in crowds. *Id.* at 423.

The ALJ accepted that Saunders has impairments that limit her to a restricted range of light and sedentary work, excluding work requiring her to sit more than 6 hours or be on her feet more than 2 hours during the workday. The ALJ also accepted that Saunders cannot climb or crawl, has postural limitations and cannot tolerate frequent exposure to extreme temperatures. The ALJ accepted that Saunders's psychological impairments preclude work requiring complex or difficult tasks or instructions, interaction with the general public, or working with coworkers as a team. *Id.* at 20. The ALJ rejected Saunders's assertions of functional limitations in excess of this RFC assessment and that she cannot perform substantial gainful activity.

In deciding whether to accept subjective statements, an ALJ must perform two stages of analysis. The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Smolen v. Chater*, 80 F3d 1273, 1281-82 (9th Cir. 1996); *Cotton v. Bowen*, 799 F2d 1403, 1407-08 (9th Cir 1986). At the second stage, an ALJ may discredit a claimant's testimony regarding

3 - OPINION AND ORDER

the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993); *Smolen*, 80 F3d at 1283. The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995). The ALJ may consider objective medical evidence, the claimant's treatment history, daily activities, and work record, and the observations of treating sources and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F3d at 1284; SSR 96-7p, 1996 WL 374186.

The ALJ found the objective medical evidence, treatment records, and reports of medical providers did not support Saunders's assertions of debilitating symptoms. For example, Saunders alleged disability beginning in February 2001, but did not seek treatment for any of her allegedly disabling conditions until December 2001, when she first reported symptoms of carpal tunnel syndrome. Admin. R. 70, 173. She first reported symptoms of Bell's Palsy in February 2002. *Id.* at 172. She did not mention her most debilitating conditions, the burning sensation in her feet and depression, until April 2004. *Id.* at 202-10. Notably, she did not report these conditions to obtain treatment, but in consultative evaluations to further her claim for disability. *Id.* By that time, Saunders's insured status for the purposes of her Title II claim had long expired. The ALJ could draw an adverse inference as to credibility from this evidence that Saunders did not seek treatment for her allegedly disabling conditions until several years after she allegedly became disabled. *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001).

In addition, the medical findings and treatment records did not support the intensity or persistence of the symptoms Saunders claimed. For example, Saunders was treated for "probable bilateral carpal tunnel syndrome" in December 2001 with nonprescription medication and wrist

4 - OPINION AND ORDER

splints. Admin. R. at 173. She did not report carpal tunnel symptoms again until her consultative evaluation by Peter Verhey, M.D., in April 2004. *Id.* at 203. Dr. Verhey elicited no objective findings of carpal tunnel syndrome. He found Saunders's symptoms resulted from a temporary period of overuse and were improving without treatment. *Id.* at 205. Dr. Verhey concluded, "there are no manipulative limitations." *Id.* at 206. Saunders did not report carpal tunnel symptoms to any medical provider thereafter. The ALJ could reasonably find this evidence undermined Saunders's testimony that carpal tunnel syndrome prevents her from driving or holding a pencil or pen for more than 20 minutes and limits the use of her hands to one hour per day.

Saunders first reported the burning sensation in her feet in April 2004 to Dr. Verhey. *Id.* at 202. She did not report functional limitations, *per se*, but said she could not wear socks or closed-toe shoes. *Id.* Dr. Verhey could not determine the etiology of the hyperesthesia in Saunders's feet and was unsure whether it would contribute to any workplace restriction, although Saunders suggested her inability to wear shoes would have prevented her from doing her past work in a sandwich shop. *Id.* at 205, 206. Dr. Verhey opined the number of hours Saunders could be expected to stand and/or walk in an 8-hour workday would not be restricted. *Id.* at 205.

Saunders first reported the neuropathy in her feet to a treating source when she became a patient of Miriam Gage, M.D., in October 2005. *Id.* at 336. Dr. Gage recommended diet and exercise to treat Saunders's obesity. In January 2006, fasting blood sugar levels suggested possible diabetes. *Id.* at 331. In February 2006, laboratory work confirmed the diabetes diagnosis. *Id.* at 330. The treatment notes suggest both Saunders and Dr. Gage considered the neuropathy no more significant than contraception concerns or treatment for an ingrown toenail. *Id.* at 330.

In December 2006, Scott Bleazard, M.D., examined Saunders and found she had "mildly decreased sensation" in the toes of both feet and diagnosed peripheral neuropathy associated with diabetes. *Id.* at 389. Sensation was intact in the rest of Saunders's lower extremities, she had normal gait and tandem gait, and demonstrated the ability to heel and toe walk and rapidly alternate movements without difficulty. *Id.* Saunders did not indicate that her knees became numb when she stood for 20 minutes. She did not include standing when describing the things that seemed to make her neuropathy worse. *Id.* at 387. Dr. Bleazard did not suggest the neuropathy would spread to Saunders's knees after a brief period of standing; he opined Saunders could be expected to stand or walk at least two hours in an eight-hour workday. *Id.* at 390.

Saunders admitted to Dr. Bleazard she rarely complied with medical instructions to check her blood sugars regularly for proper implementation of diabetes treatment. *Id.* at 387. The ALJ could reasonably conclude from the minimal medical findings, Saunders's failure to seek treatment for this allegedly debilitating condition, and her failure to comply with treatment after it was identified as diabetic neuropathy, that her symptoms were not as severe as she claimed in her testimony and written allegations.

Saunders claimed "a lot of depression with suicidal ideation" during a consultative evaluation by Alison Prescott, Ph.D., in April 2004. *Id.* at 208. Saunders had a restricted affect and her mental status examination suggested moderate depression, good short term memory, logical thought processes, mild impairment of concentration, and low average intellectual function. *Id.* at 209. Standardized intelligence testing placed her in the low average range of cognitive skills. *Id.* at 209-10. Significantly, this assessment reflected Saunders's condition before any mental health treatment and Dr. Prescott opined she would likely benefit from antidepressant medication. *Id.* at 210.

6 - OPINION AND ORDER

Saunders participated in counseling and treatment with medication at South Lane Mental Health Services ("SLMH") from October 2004 through June 2005. *Id.* at 234-63. Saunders experienced a decrease in her depressive symptoms with the medication Lexapro. After two months, her mood was euthymic, affect congruent, and the rest of her mental status examination essentially normal. *Id.* at 247. At her next medication review in May 2005, Lexapro continued to be helpful and the dose was increased. Her mood was neutral and all other findings within normal limits. *Id.* at 236. Counseling sessions focused on her relationship with her boyfriend and problems maintaining a stable housing situation. Her therapist, Nancy McCollom, M.S., repeatedly urged her to contact vocational rehabilitation services to obtain employment, reduce her financial dependence on her boyfriend, and stabilize her housing situation. *Id.* at 235, 237, 238, 239, 241. Saunders did not do so.

In January 2006, Saunders reinitiated services at SLMH for chronic depression related to relationship conflicts stemming from constant crises in her financial and housing situations. *Id.* at 319. Her mental health providers suggested her reported suicidal ideation and depression were "often less serious than she purports." *Id.* at 321. In February 2006, Saunders reported mood swings. Nancy Bidlock, N.P., started her on Lamictal to target those symptoms. *Id.* at 317. Saunders discontinued Lamictal and increased her dosage of Lexapro for depression in March 2006. She discontinued treatment with SLMH in April 2006. *Id.* at 311, 313.

In December 2006, Saunders underwent a psychodiagnostic interview with David Truhn, Psy.D., regarding her allegations of Bipolar Disorder and other diagnoses. Dr. Truhn suggested Saunders's subjective symptom reporting was not reliable due either to exaggeration or to poor comprehension and communication as a result of low intellectual functioning. *Id.* at 381. He

7 - OPINION AND ORDER

recommended corroboration through collateral informants and trusted observation. *Id.* Dr. Truhn had no such corroboration, however, and reached his conclusions based primarily on Saunders's subjective reports. He diagnosed Intermittent Explosive Disorder, but opined Saunders's anger management symptoms were controlled effectively by the mood stability medication Geodon. He diagnosed Dysthymic Disorder based on a consistent, moderate level of depression. He did not find support for a Bipolar Disorder diagnosis. With respect to the functional impact of these conditions, Dr. Truhn opined that Saunders continued to accomplish activities of daily living, but in a slowed fashion. *Id.* at 385.

Based on the mild mental health findings, indications that her depressive and anger management symptoms were improved with treatment, suggestions that her reports were not reliable due to exaggeration, poor comprehension, or poor communication, the situational focus of her depression, and her failure to follow treatment recommendations to alter her situation through vocational rehabilitation, the ALJ could rationally conclude that Saunders's mental health symptoms were not as severe as she alleged.

Similarly, the medical findings do not support functional limitations from Bell's Palsy, a bone spur in the foot, or residual back problems from a childhood accident. In February 2002, Saunders had acute facial nerve paralysis causing droopy numbness on the left side of her face. *Id.* at 162-63. This improved over the following weeks but left Saunders with some weakness causing a decreased ability to smile, but no other functional limitation. *Id.* at 168, 170. In April 2002, Saunders sought emergency room care for left foot pain which had persisted for 2 weeks. *Id.* at 190. X-rays were negative. *Id.* at 192. The attending physician believed they showed a "very tiny spur on the calceneus" and diagnosed "a possible spur formation." *Id.* at 190. Saunders did not report

these symptoms again. Saunders sought emergency room treatment for right sided back pain in December 2002. *Id.* at 185. This was thought to be a muscle strain instead of a chronic problem. *Id.* at 186. There is no other evidence of back problems.

Saunders's work history did not support her assertions of disability. Saunders last worked as a childcare provider for her sister. The job ended when her sister started using drugs and lost her state funding for childcare. *Id.* at 208, 414. She worked at a Subway sandwich shop for two previous periods and quit both times to move to a different state. *Id.* at 91-92, 208. She has never stopped working due to the impairments she alleges. *See Bruton v. Massanari*, 268 F.3d at 828 (Sufficient reasons for disregarding subjective testimony include stopping work for non-medical reasons and failure to seek care at the time claimant stopped work).

Finally, the ALJ noted that contrary to the allegations of debilitating symptoms, Saunders, her lay witness, and the medical sources reported that she engaged in a broad range of activities that would be inconsistent with functional limitations in excess of those in the ALJ's RFC assessment.

In conclusion, the ALJ's reasoning for discrediting Saunders's assertions of functional limitations in excess of the RFC assessment and the inability to engage in substantial gainful activity are clear and convincing and sufficiently specific for me to conclude that the ALJ did not discount them arbitrarily. Accordingly, the ALJ's credibility determination will not be disturbed.

### B. Medical Opinion of Dr. Bleazard

Saunders contends the ALJ ignored a small part of Dr. Bleazard's opinion. As described previously, Dr. Bleazard performed a consultative evaluation in December 2006 to assess the neuropathy in Saunders's feet. Dr. Bleazard diagnosed diabetic neuropathy, manifesting in mildly decreased sensation in the toes. Admin. R. 390.

Dr. Bleazard indicated Saunders could be expected to stand or walk at least two hours in an eight-hour workday and sit without limitation. He opined Saunders could lift or carry 20 pounds occasionally and 10 pounds frequently. He opined Saunders's obesity limited her positional abilities to occasional stooping, kneeling, and crouching and precluded crawling or climbing. He found no manipulative limitations. He expected workplace environmental limitations to include "occasional exposure to extreme cold, extreme heat, and vibration." *Id.* The ALJ's RFC assessment is generally consistent with Dr. Bleazard's findings, but does not include an environmental limitation of exposure to vibration. *Id.* at 20, 21, 450. Saunders argues the ALJ erroneously ignored Dr. Bleazard's opinion.

The uncontradicted opinion of an examining physician can be rejected only for clear and convincing reasons. *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002). The ALJ noted that Dr. Bleazard's findings were based primarily on Saunders's subjectively reported history. Admin. R. 21. An ALJ can properly reject a physician's opinion that is premised on the claimant's subjective complaints which the ALJ has properly discounted. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). In addition, no medical provider other than Dr. Bleazard noted any difficulty with respect to exposure to vibration. Saunders did not mention any such difficulty in her written allegations, testimony, or statements to treating sources. Furthermore, Saunders has not identified information suggesting the occupations identified by the VE as examples of other work within her RFC, require frequent exposure to vibration.

In summary, Dr. Bleazard's opinion regarding exposure to vibration was based primarily on unreliable subjective reports and inconsistent with the record as a whole. There is no evidence that the limitation would have precluded the occupations identified by the VE as examples of other work

in the national economy which Saunders could perform. If the ALJ's reasons for excluding this limitation from the RFC assessment were not entirely clear, any error was harmless.

### C.     Development of the Record

After his psychodiagnostic interview, Dr. Truhn stated, "intelligence testing may help clarify her intellectual needs and concerns." Admin. R. 386. Saunders now argues the ALJ should have ordered a psychological evaluation with intelligence testing in order to accurately assess her mental impairments.

In social security disability cases, the initial burden of proving disability is on the claimant. *Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5; *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005). Concurrently, "the ALJ has a duty to assist in developing the record." *Reed v. Massanari,* 270 F.3d 838, 841 (9th Cir. 2001) (quoting *Armstrong v. Comm'r of the Soc. Sec. Admin.,* 160 F.3d 587, 589 (9th Cir. 1998)). An ALJ assists in developing the record by requesting records and reports from physicians identified by the claimant. 20 C.F.R. §§ 404.1519(d), 416.919(d). The ALJ may order a consultative evaluation if the information available from the claimant's source is inadequate or ambiguous. *Id.* at §§ 404.1512(f), 416.912(f).

The ALJ's duty to conduct an appropriate inquiry is triggered only when the evidence is ambiguous or when the record is inadequate to allow for proper evaluation of the evidence and determination of the issue of disability. *Mayes v. Massanari,* 276 F.3d 453, 459-60 (9th Cir. 2001); *Tonapetyan v. Halter,* 242 F.3d at 1150 ; *Smolen v. Chater,* 80 F.3d at 1288.

Here, the ALJ found it unnecessary to order additional intelligence testing because formal intelligence testing was performed by Dr. Prescott in April 2004. Admin. R. 207-10. The test scores were in the low average range, generally consistent with Dr. Truhn's conclusions and the record as

a whole. There was no ambiguity or inadequacy regarding Saunders's intellectual capacity and cognitive skills. Accordingly, the ALJ had no duty to develop the record further by ordering intelligence testing.

        D.      <u>**Obesity**</u>

The ALJ acknowledged Saunders's obesity at step two of the decision-making process. *Id.* at 19. As noted previously, the ALJ accepted Dr. Bleazard's functional assessment. *Id.* at 21. Dr. Bleazard's functional assessment included the following: "Her obesity does also limit her positional abilities. . .postural limitations include occasional stooping, kneeling, and crouching. No crawling or climbing is expected." *Id.* at 390. Accordingly, the ALJ complied with SSR 02-01p, 2000 WL 628049, under which an ALJ must consider the effects of obesity in the decision-making process.

The ALJ considered all evidence of functional impairment from all sources in combination. Saunders has not identified evidence of any functional limitations resulting from her obesity that the ALJ failed to consider, and the court finds none in the record. Accordingly, Saunders failed to carry her burden of proving that she has functional limitations from obesity which the ALJ failed to consider in the remaining steps of the decision-making process.

        II.      <u>**Vocational Evidence**</u>

Saunders contends the ALJ elicited testimony from the VE with a hypothetical question that did not contain all of her limitations and restrictions. She contends the ALJ should have included additional limitations based on alleged errors in the ALJ's RFC assessment. Her arguments in support of those errors cannot be sustained for reasons discussed previously in this opinion.

The ALJ considered all the evidence and framed her vocational hypothetical question based on the limitations supported by the record as a whole; the hypothetical limitations reflected

reasonable conclusions that could be drawn from the evidence in the record. An ALJ is not required to incorporate limitations based on evidence that she properly discounted. *Batson v. Comm'r*, 359 F.3d at 1197-98.

The court must uphold the Commissioner's determination if it is supported by substantial evidence, even if the evidence can rationally be interpreted in a way that supports Saunders's assertion of additional limitations. *Andrews v. Shalala,* 53 F.3d at 1039 ; *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999). Saunders's contention that the Commissioner's determination was based on improper vocational testimony cannot be sustained.

## CONCLUSION

For these reasons, the court **AFFIRMS** the Commissioner's decision and **DISMISSES** this matter.

IT IS SO ORDERED.

Dated this ___14th___ day of October, 2008.

      /s/ Garr M. King
      GARR M. KING
      United States District Judge